United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

M.J.,
Plaintiff,
v.
SSA COMMISSIONER, et al.,
Defendants.

Case No. 25-cv-07221-LJC

**ORDER RESOLVING SOCIAL SECURITY ACTION**

Re: Dkt. Nos. 20, 22

Plaintiff M.J.[1] challenges the final decision of the Commissioner of Social Security (the Commissioner) denying her applications for social security disability insurance benefits and supplemental security income benefits. *See* ECF No. 1 (Compl.) ¶ 6. M.J. and the Commissioner consented to magistrate judge jurisdiction and filed briefs on the merits in accordance with the Federal Rules of Civil Procedure's Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). ECF Nos. 20, 22. For the reasons discussed below, the Court finds in favor of M.J. The matter is REMANDED for further administrative proceedings consistent with this Order. The Clerk shall enter judgment in favor of M.J.

## I. BACKGROUND

M.J. is a fifty-five-year-old woman who lives with her children in Hayward, California. AR at 44, 103.[2] She applied for disability benefits on November 17, 2022, claiming a disability onset date of September 15, 2018. *Id.* at 226. She suffers from migraines, generalized anxiety

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials. This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] This Order cites to the administrative record using the continuous page numbers applied by the Commissioner. This Order cites all other documents filed on the docket by page numbers assigned by the Court's ECF filing system, unless otherwise indicated.

disorder, obesity, and hypertension, among other conditions, which she claims prevent her from working. *Id.* at 254. M.J. previously worked as a home health aide and cook at an assisted living facility but has not worked since her alleged disability onset date. *Id.* at 255; *see id.* at 45-49.

M.J.'s applications for benefits were denied initially on December 27, 2022 and on reconsideration on October 26, 2023. *Id.* at 118, 127. She then requested a hearing in front of an administrative law judge (ALJ). *See id.* at 156. The administrative hearing was held in front of ALJ Debra Underwood on April 5, 2024. *See id.* at 35, 181. M.J., who was represented by counsel, testified about her past work experience, medical conditions, and physical and mental limitations. *See id.* at 44-59. Vocational expert Tavores Boyd testified about the types and number of jobs available in the national economy for a hypothetical individual of M.J.'s age, education, and work experience with varying types of limitations. *Id.* at 60-65. Following the hearing, ALJ Underwood denied M.J.'s applications. *Id.* at 14-30. M.J.'s subsequent request for review was denied, *id.* at 1-6, and she preceded to file the instant lawsuit claiming that the ALJ's decision was not based on substantial evidence and constituted legal error. *See* Compl. ¶ 8.

**A. Medical History**

This summary is not intended as a complete statement of the administrative record or of all relevant evidence but rather summarizes the medical evidence most pertinent to the ALJ's decision, the briefs in this matter, and the Court's analysis.

Among other conditions, M.J. suffers from migraines, hypertension, obesity, anxiety, and depression. M.J.'s medical records indicate a history of headaches as early as January 2018. *See* AR at 602, 655, 678. On October 14, 2019, she saw her doctor for, among other conditions, her "[n]onintractable episodic headache, unspecified headache type." *Id.* at 583. She was prescribed amitriptyline and ordered to undergo a head computed tomography (CT) scan, which was normal. *Id.* at 583, 430, 434. During a doctor's visit on December 20, 2019, she reported having "frequent headaches" lasting over two hours with photophobia and blurry vision. *Id.* at 430. At that point, she had been taking ten milligrams of amitriptyline but had not "noticed a difference" in her migraines. *Id.* Her doctor increased her amitriptyline dosage from ten milligrams to half of a fifty-milligram tablet with the option of taking the entire fifty-milligram tablet if the lesser dose

did not provide relief. *Id.* at 430, 582. (The medical records indicate that M.J. took a full fifty-milligram tablet each night. *See id.* at 399.) By December 2019, M.J. was also taking citalopram (CeleXA) for her migraines. *Id.* at 431. She stopped taking citalopram in October 2020 but continued taking the higher dose of amitriptyline. *Id.* at 576. By December 2021, she was taking sumatriptan (Imitrex) for her migraines in addition to amitriptyline. *Id.* at 417, 560. Her medical records reflect the increased amitriptyline dosage improved her symptoms and caused her migraines to decrease in frequency from occurring daily to once or twice per week. *Id.* at 415, 424, 426-27. She did not experience auras and her migraines did not last more than seventy-two hours. *See id.* However, she reported experiencing "acute" and "[t]hrobbing" pain at the back of her head, sensitivity to light, and, at least occasionally, vomiting and nosebleeds. *Id.* at 410, 416. She was prescribed naproxen for acute headaches. *Id.* at 416.

During this same timeframe, M.J.'s body mass index (BMI) ranged from 38 $kg/m^2$ to 41 $kg/m^2$. *Id.* at 393, 431. She is described as being obese. *Id.* at 393, 403, 412.

### B. Administrative Hearing

During the administrative hearing, M.J. testified about her prior work experience and current limitations caused by her medical conditions. She testified that she previously worked as the head cook and a home health aide in a residential facility for disabled adults, and before that worked as an in-home support services provider for her elderly father. AR at 45-48. She explained that her jobs at the residential facility required her to be on her feet, climbing and descending stairs, and regularly carrying heavy bags of food. *Id.* at 46-47.

She testified that she stopped working in 2018 because of her migraines and depression caused by an abusive relationship. *Id.* at 50-51. She testified that she takes Lexapro to treat her depression and amitriptyline for her migraines, *id.* at 51-52, and explained that she cannot drive because her medications make her drowsy. *Id.* at 45. When the ALJ asked about her headaches, M.J. explained that she needs to have the lights off and her eyes closed when she had a migraine, because the light hurts her head and eyes. *Id.* at 53-54. Although she testified that she "rarely" got migraines since starting amitriptyline, she clarified that she still had migraines "twice a week, but before was mostly every day." *Id.* at 54, 58. She testified that her headaches lasted thirty

minutes and she would spend fifteen to twenty minutes in a dark room to protect against light or "loud sounds." *Id.* at 58-59. She explained that taking her migraine medication would "put [her] to sleep." *Id.* at 54.

When asked about her daily route, M.J. testified that after she wakes up each day, she takes her medication and coffee. *Id.* at 56. Her older children take her youngest son to school and then go to work, leaving her home alone. *Id.* She explained that she spent her days watching television and doing household chores, such as doing dishes, cleaning the bathroom, and cooking simple meals such as pasta or microwaveable food. *Id.* She testified that she "can't stand very . . . long" because her back ached, which she believed was caused by her weight or her feet, and so she completed chores in five-minute increments. *Id.* at 57. She testified that she got out of breath climbing up the stairs in her house and could walk comfortably for only ten to fifteen minutes. *Id.* at 57-58.

The vocational expert, Tavores Boyd, testified that M.J.'s skills from her prior jobs could transfer to jobs at the "light" exertional level (such as canteen operator, counter attendant, food assembler), but no jobs at the "sedentary" exertional level. *Id.* at 60-61. The ALJ presented Mr. Boyd with a number of hypotheticals. *See id.* at 61. First, she asked him if an individual of M.J.'s same age, education, and work experience who had no limits on their ability to sit, stand, or walk; who could carry up to fifty pounds, use stairs, and balance, stoop, kneel, crouch, or crawl occasionally; but who could not use ladders, ropes, scaffolds, or work at unprotected heights could perform M.J.'s prior jobs. *Id.* at 62. He testified that such an individual could work M.J.'s prior jobs and would also be able to work a number of other jobs at the "medium" exertional level, including packer hand, bagger, and poultry dresser. *Id.* The ALJ next asked Mr. Boyd if an individual of M.J.'s same age, education, and work experience who could sit for six hours but only walk or stand for two hours per day; who could carry twenty pounds, use ramps and stairs, and balance, stoop, kneel, crouch or crawl occasionally; who could use both arms for fine manipulation; but who could not use ladders, ropes or scaffolds could perform M.J.'s prior jobs. *Id.* at 62-63. Mr. Boyd testified that such an individual could not work M.J.'s prior jobs, but could work sedentary jobs such as a clerk typist, order clerk, or election clerk. *Id.* at 63. M.J.'s attorney

then asked Mr. Boyd if work would be available if that hypothetical person "needed additional breaks such that they were off task . . . 15 percent of the time" or absent two days a month. *Id.* at 64. Mr. Boyd testified that these limitations would be work-preclusive, as employees "[t]ypically" tolerated employees being off-task only ten percent of the workday and absent "a maximum of one day per month on a consecutive basis." *Id.*

### C. The Five-Step Framework

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
>
> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).
>
> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).
>
> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. See 20 C.F.R. § 404.1520(e).
>
> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not

> entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (9th Cir. 2020). "Between the third and fourth steps, an ALJ determines a claimant's residual functional capacity, i.e., the extent of mental and physical activities a claimant can perform in a work setting despite their limitations." *Nadon v. Bisignano*, 145 F.4th 1133, 1135–36 (9th Cir. 2025).

"At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2. "At step five of the sequential process, the agency may meet its burden either '(1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines,'" known as "the grids," which are a "short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Id.* at 1130 (quoting *Tacket*, 180 F.3d at 1099, 1101). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, they do not proceed to the next step. 20 C.F.R. § 404.1520(a)(4).

**D. The ALJ's Decision**

The ALJ issued her decision denying M.J.'s applications for disability benefits on August 1, 2024. AR at 14. The decision followed the five-step process outlined above. At step one, the ALJ determined that M.J. did not engage in any substantial gainful activity since September 5, 2018, M.J.'s alleged disability onset date. *Id.* at 19. At step two, the ALJ determined that M.J. suffered from the following severe medically determinable impairments: migraine headaches and obesity. *Id.* She determined that M.J.'s hypertension and hyperlipidemia were "relevantly asymptomatic" and non-severe, and that her anxiety and depression did "not cause more than minimal limitation in [M.J.'s] ability to perform basic mental work activities and are therefore non-severe." *Id.* at 20. At step three, the ALJ determined that M.J.'s impairments did not meet or equal one of the specific impairments listed at 20 C.F.R. §§ 404.1520(d), 404.1525, 414.1526, 416.920(d), 416.925, or 416.926. *Id.* at 23.

The ALJ next evaluated M.J.'s residual functional capacity (RFC), which is defined as "the

most" a claimant "can still do despite [their] limitations." 20 C.F.R. § 416.945(a); *see* AR at 24. She determined that M.J. had the capacity to perform a limited range of work at "medium" exertional level, as she had "no limitations on sit[t]ing, standing, or walking[;]" could lift and carry fifty pounds occasionally and twenty-five pounds frequently; could occasionally use steps, stairs, and occasionally balance, stoop, kneel, crouch, or crawl; and could never use ladders, ropes, scaffolds, or work at unprotected heights. AR at 24. The ALJ explained that she made this finding after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," as well as medical opinions and prior administrative medical findings. *Id.* The ALJ determined that M.J.'s "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms" but that her statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.*

Addressing M.J.'s migraines, the ALJ determined that "the record is insufficient to support the extent of limitations alleged" or to preclude M.J. from working at the "medium" exertional level. *Id.* at 25. She explained that the record demonstrated that M.J.'s migraines were "responsive to and/or improved with symptomatic treatments," that M.J. did not undergo diagnostic brain imaging or EEGs, and did not require "urgent or emergent medical attention" or overnight or inpatient hospital admission related to her migraines. *Id.* Addressing M.J.'s obesity, the ALJ noted that although M.J. "*may* have appeared 'off-balance' and 'unsteady' with 'abnormal' rapid alternating movements of the hands and toes" during her consultative physical examination, the record was insufficient to support additional limitations that would preclude M.J. from working at the "medium" exertional level because the record did not include other documentation of "abnormal musculoskeletal or neurological examination findings" or particular physical symptoms, such as chest pain, palpitations, or impaired respiratory or cardiovascular functioning. *Id.* (quoting AR at 692-93).

The ALJ explained that the RFC accounted for M.J.'s limitations caused by her migraines and obesity by restricting her to "less than a full range of work at the medium exertional level,"

by, among other things, not requiring her to use ladders or scaffolds or working at unprotected heights and limiting her to "occasionally" using stairs, lifting fifty pounds, and stooping, balancing, kneeling, or crawling. *Id.* at 26.

At step four, the ALJ determined that M.J. was unable to perform any relevant work that she had done in the past. The ALJ determined that M.J. did not have "past relevant work," as defined by 20 C.F.R. §§ 404.1565 and 416.965, as M.J. had not performed substantial and gainful work in the last five years. *Id.* at 28. However, at step five, the ALJ determined that, based on the vocational expert's testimony, M.J. would be able to make "a successful adjustment to other work that exists in significant numbers in the national economy," and thus was not disabled. *Id.* at 29-30.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court has authority to review a Commissioner's decision to deny disability benefits to a claimant. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The district court's role is "to ensure that the [ALJ's] decision was supported by substantial evidence and a correct application of the law." *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012) (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). The Court must "consider the entire record as a whole, 'weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)). "Where the evidence can reasonably support either affirming or reversing the decision, [the Court] may not substitute [its] judgment for that of the Commissioner." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759

F.3d 995, 1010 (9th Cir. 2014).

## III. ANALYSIS

M.J. argues that the ALJ's RFC determination, made between the third and fourth steps of the process to determine benefit eligibility, was improper because she rejected M.J.'s symptom testimony without a sufficient basis for doing so. ECF No. 20 at 7. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record, including, *inter alia,* medical records, lay evidence, and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883 (internal quotations omitted). "Careful consideration" must "be given to any evidence about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone." *Id.* (internal quotations omitted). "An RFC that fails to take into account a claimant's limitations is defective." *Valentine*, 574 F.3d at 690. "[S]ubstantial evidence does not support an ALJ's RFC assessment if 'the ALJ improperly rejected [the claimant's] testimony as to the severity of his pain and symptoms.'" *Ferguson v. O'Malley*, 95 F.4th 1194, 1199 (9th Cir. 2024) (quoting *Lingenfelter*, 504 F.3d at 1035).

### A. Legal Standard for Evaluating Symptom Testimony

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited." *Trevizo v. Berryhill,* 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Garrison*, 759 F.3d at 1014). "In this analysis, the claimant is *not* required to show 'that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.'" *Garrison*, 759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1991)). If the claimant meets this requirement and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id.* at 1014-15 (quoting *Smolen*, 80 F.3d at 1281); *see Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020). "This is not an easy

requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). To satisfy the "clear and convincing reasons" requirement, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Reddick*, 157 F.3d at 722). The ALJ may "only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each" finding. *Robbins*, 466 F.3d at 883. In weighing the claimant's credibility, the ALJ may consider many factors, including:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1284). The ALJ may also include observations of treating physicians and "other third parties regarding, among other matters, the nature, onset, duration, and frequency of the claimant's symptom; precipitating and aggravating factors; [and] functional restrictions caused by the symptoms." *Smolen*, 80 F.3d at 1284. The ALJ's reasons must be "supported by substantial evidence in the record." *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002). An ALJ may not discredit a claimant's subjective symptom testimony "solely because" their symptoms "are not substantiated by objective medical evidence." SSR 96-7p, 1996 WL 374186, at *1.

**B. Analysis**

There is no dispute that the ALJ determined that M.J. presented medical evidence of her underlying impairments "which could reasonably be expected to produce the pain or other symptoms alleged." *Trevizo*, 871 F.3d at 678 (internal quotations omitted); *see* ECF Nos. 20 at 8, 22 at 3; AR at 24 ("I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms . . . ."). The ALJ did not cite to any evidence of malingering. *See* AR at 24. Thus, the ALJ could only discount M.J.'s testimony

regarding the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Treviso*, 871 F.3d at 678.

**1. Migraines**

The ALJ determined that M.J.'s claimed symptoms of her migraines were "not entirely consistent with the medical evidence and other evidence in the record." AR at 24. The ALJ explained that M.J. described experiencing migraines up to two to three times per week, with "accompanying sensitivity to light and loud noise and 'blurry' vision," and that her migraines interfered with her day-to-day activities. *Id.* at 25. The ALJ determined that the record was insufficient to support the extent of the symptoms alleged, based on the following:

> For example, the evidence of record demonstrates that the claimant's migraine headaches and associated symptoms have been responsive to and/or improved with symptomatic treatments ([Exhibits 5E/5; 1F/15-18, 46, 47-51 & 2F/2], see also Exhibit 1F/38, 43). In addition, the claimant was not referred for additional workup and/or repeat diagnostic imaging scans of the brain or head, or ambulatory digital electroencephalogram (EEG), to determine the correct headache diagnosis or exclude secondary causes of these headache episodes, e.g., acute intracranial hemorrhage, cerebral infarct, cortical and subcortical dysfunction, mass-lesion, vascular malformations, epileptiform discharges, infection, or trauma or injury to the head or neck (See Exhibit 1F/50). Moreover, the claimant did not require urgent or emergent medical attention with the administering of fluids and/or "migraine cocktail" on a frequent basis nor did she require overnight observation or inpatient admission for any tension-type and/or migraine headache attacks lasting more than 72 hours during this period.

*Id.*

As explained below, these are not valid reasons to discount M.J.'s symptom testimony regarding the severity of her migraines. First, the medical records are generally consistent with M.J.'s symptom testimony, not inconsistent as the ALJ claims. Second, that M.J.'s symptoms improved with treatment does not mean that her symptoms are not severe or disabling. Third, without evidence that more aggressive treatment was available or would be useful, that M.J. was "not referred for additional" screening or received emergency treatment does not undermine M.J.'s symptom testimony. *Id.* Lastly, lack of objective medical records showing that she received urgent medical care for her migraines is not a legitimate reason for rejecting M.J.'s symptom testimony. This reasoning is explained in greater detail, as follows:

Although the ALJ claims that M.J.'s "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record," the records she cites to in her decision are generally *consistent* with M.J.'s symptom testimony. *Id.* at 24. In relevant part, M.J. testified that she used to get daily migraines, but since starting amitriptyline, her migraines decreased in frequency to once or twice per week. *Id.* at 53. She testified that when she got a migraine, she had to rest in a dark room with the door closed as she was sensitive to light and loud noise. *Id.* at 58-59. She testified that after she took her medication, it would take twenty to thirty minutes for the medication to take effect and would cause her to fall asleep. *Id.* at 54. The medical records are generally consistent with this testimony. A progress note from December 20, 2019 reflects that M.J. experienced "frequent headaches" with photophobia and blurry vision that lasted over two hours. *Id.* at 430. At that point, she took ten milligrams of amitriptyline nightly but did not notice "a difference." *Id.* Her dose was increased to half of a fifty-milligram tablet per night, with instructions to increase the dose to the full tablet if the lower dose was not effective. *Id.* at 433. A progress note from September 2, 2020, indicated that the increased amitriptyline dose was "helping her migraines." *Id.* at 429. A progress note from October 21, 2020 described M.J. as not having "that much" headaches, but—consistent with her testimony—noted that she experienced migraines twice per week rather than daily. *Id.* at 426. Subsequent progress notes confirmed that M.J.'s migraines "[i]mproved with amitriptyline" and she continued to get migraines approximately two times per week rather than every day. *Id.* at 398, 407, 421. The progress notes consistently indicate that M.J.'s migraines did not last more than seventy-two hours. *See id.* at 439.

Both the medical records and M.J.'s testimony indicate that after M.J. began taking her increased dose of amitriptyline, her migraines decreased in frequency from daily to twice per week and did not last multiple days. Although "*inconsistent* objective medical evidence in the record" can be used to discount symptom testimony, given the consistency between the medical records and M.J.'s testimony about her symptoms, the ALJ's decision to discount M.J.'s symptom testimony based on purported inconsistencies with the medical record was erroneous. *Ferguson*, 95 F.4th at 1200-01.

As described above, both the medical records and M.J.'s testimony reflect that the frequency and severity of M.J.'s migraines decreased when M.J. began taking a high dose of amitriptyline. *See* AR at 58 ("[S]ince I'm on this medication, it's twice [a week]"); 407 ("Migraine headache frequency is less than before now. Used to have daily. Now 2 times a week."). The ALJ discounted M.J.'s testimony, in part, because her headaches and associated symptoms had improved with medication, and the Commissioner argues that this is a viable reason for rejecting M.J.'s symptom testimony. *Id.* at 25; ECF No. 22 at 5. But improvement is relative: the fact that M.J.'s symptoms improved shows that they were not as bad as they once were, not that they improved to a point that they were nondisabling. *Garrison*, 759 F.3d at 1017 (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)) (explaining that medical notes indicating "some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace"). The ALJ's evaluation that M.J. improved with treatment, without regard to M.J.'s actual functional abilities, was not a clear and convincing reason to discredit M.J.'s testimony.

The ALJ also explained that M.J.'s failure to obtain diagnostic imaging scans or receive "urgent or emergent" medical attention undercut her symptom testimony. AR at 25. The Commissioner contends this is a viable reason for discounting M.J.'s symptom testimony. *See* ECF No. 22 at 5-6. "[E]vidence of 'conservative treatment" is a legitimate basis for discounting a claimant's testimony regarding the severity of an impairment. *Parra*, 481 F.3d at 751 (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)). But what constitutes "conservative treatment" necessarily turns on what treatment is available and "whether a claimant experiencing the symptoms testified to would be expected to seek further treatment." *Remi S. v. Comm'r of Soc. Sec.*, No. 25-cv-1373, 2025 WL 3653716, at *2 (W.D. Wash. Dec. 17, 2025). M.J. underwent a head CT, which had normal findings, and consistently sought treatment and took prescription medication for her migraines. *See* AR at 406-07, 426, 430. The ALJ cites to no evidence in the record showing that the "more aggressive treatment options" she describes in her decision "were appropriate or available" to M.J. *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010). "A claimant cannot be discredited for failing to pursue non-conservative

treatment options where none exist" or where none would effectively address her symptoms. *Id.*; *see Annette P. v. Comm'r of Soc. Sec. Admin.*, 578 F. Supp. 3d 1179, 1184 (D. Or. 2022) (finding "plaintiff's failure to seek" more aggressive treatment when there was "no reference in the record to any additional, available care that plaintiff failed to obtain" not sufficient reason to discount symptom testimony). Absent such evidence, or evidence that M.J. refused treatment that was offered to her, the ALJ's decision to discount M.J.'s symptom testimony due to an absence of more aggressive treatment or diagnostics was improper.

Moreover, to the extent that the ALJ rejected M.J.'s symptom testimony based on a "lack of medical evidence," such as a lack of medical records showing that M.J. sought emergency treatment, "to fully corroborate the alleged severity of pain," doing so was improper. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005); *see Ferguson*, 95 F.4th at 1200 (explaining that the "absence of positive medical evidence" did not indicate claimant could not "experience severe and frequent headaches" and thus was not proper basis for discrediting symptom testimony) .

The Court accordingly concludes that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for discounting M.J.'s symptom testimony regarding her migraines.

**2. Obesity**

The ALJ also considered M.J.'s obesity when determining her RFC. *See* AR at 24-25. In the context of M.J.'s migraines and obesity, the ALJ generically explained that M.J.'s "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* at 24. However, she does not identify what specific testimony or statements M.J. made regarding the symptoms of her obesity are inconsistent with the medical record. *See id.* at 24-26. This is error. As described above, and ALJ may reject a claimant's symptom testimony "only by providing specific, clear, and convincing reasons for doing so." *Brown-Hunter*, 806 F.3d at 488-89. "This requires the ALJ to specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines that testimony." *Lambert*, 980 F.3d at 1277 (internal quotations omitted). Courts cannot meaningfully review "whether the ALJ provided specific,

clear, and convincing reasons for rejecting" a claimant's symptom testimony where the ALJ does not identify "*which* testimony she found not credible" and explains "*which* evidence" contradicts that testimony. *Brown-Hunter*, 806 F.3d at 494 (emphasis in original). Because the ALJ failed to identify the specific testimony she found not to be credible, the Court is unable to determine whether she made her credibility determination based on clear and convincing reasons supported by substantial evidence. *See id.*; AR at 24-26.

The Court accordingly concludes that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for determining that C.P.'s "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." AR at 24-25; *see Ferguson*, 95 F.4th at 1199.

The Court also concludes that the ALJ's errors were not harmless and that remand is warranted. "An error is harmless only if it is 'inconsequential to the ultimate nondisability determination.'" *Lambert*, 980 F.3d at 1278 (quoting *Brown-Hunter*, 806 F.3d at 494). Although the ALJ stated that she "considered the chronicity and intensity of the claimant's migraine headaches, ongoing efforts to manage them[,] . . . and associated sensitivity to light" as well as the "added effects of [M.J.'s] obesity" when formulating the RFC, the RFC does not account for the severity of M.J.'s symptoms as testified to. AR at 26. For example, M.J. testified that "due to [her] weight" she could only stand comfortably for five minutes and walk for "around" five to fifteen minutes. *Id.* at 57, 62. The RFC did not limit M.J. to walking or standing for short intervals. *See id.* at 26. Similarly, although the ALJ states that she "considered" M.J.'s migraine symptoms when formulating the RFC, the RFC does not  for M.J.'s testimony regarding the limitations caused by her frequent headaches and sensitivity to light. Thus, while the ALJ may have "considered" M.J.'s symptom testimony, the ALJ clearly discounted M.J.'s symptom testimony when formulating the RFC. *Id.* This is not to say that, on remand, the ALJ must fully credit M.J's symptom testimony, but rather there shall be a proper evaluation of M.J.'s symptom testimony, and the formulation of an accurate RFC depends, in part, on the proper evaluation of a claimant's testimony.. *See Lambert*, 980 F.3d at 1278. As the ALJ failed to provide specific, clear and convincing reasons for discounting M.J.'s symptom testimony, her RFC determination

United States District Court
Northern District of California

was improper. *See Ferguson*, 95 F.4th at 1199. Remand is thus warranted.

M.J. briefly argues that the vocational expert testified that there would be no work available for someone with her described limitations. ECF No. 20 at 15-16. The vocational expert did not go that far. He testified that someone of M.J.'s age, education, and work experience who could sit for six hours of an eight-hour day (that is, who could perform sedentary work), occasionally lift twenty pounds and use ramps and stairs, and never use ladders, ropes, or scaffolds could find work in the national economy. AR at 62-63. He later confirmed that someone with these same qualifications who needed "additional breaks such that they were off task" fifteen percent of the time, or were absent two days per month, could not find employment. *Id.* at 64. He did not address whether someone with M.J.'s additional claimed limitations—including, among other things, being unable to walk or stand for more than five to fifteen minutes at a time and needing to retreat to a dark room up to twice each week—would be able to find work. The Court anticipates that on remand, additional testimony from the vocational expert will be necessary so that the ALJ may make a proper determination as to whether M.J.'s conditions preclude work.

## IV. CONCLUSION

For the reasons discussed above, the Court REVERSES the Commissioner's decision finding M.J. not disabled and denying her application for benefits, and REMANDS the matter for further administrative proceedings consistent with this Order, including directing the Commissioner to reevaluate M.J.'s credibility as to the severity of her symptoms and what limitations to assess based on her symptoms. This may require (but is not limited to) obtaining additional medical records or testimony from M.J. regarding the severity of her symptoms and the availability and utility of more aggressive courses of treatment. Further testimony from the vocational expert may also be necessary to permit the ALJ to evaluate whether someone with M.J.'s limitations could find work in the national economy.

**IT IS SO ORDERED.**

Dated: July 29, 2026

LISA J. CISNEROS
United States Magistrate Judge